I call the next case ForeverGreen Athletic Fields v. Charles Dawson. Mr. Eisenberg? Good afternoon, your honors. Stephen Eisenberg on behalf of appellants Charles Dawson and Kelly Dawson. Your honors, if I may reserve five minutes for rebuttal. Yes, sir. I'd like to do so. Your honors, this is a novel case that's presented to the court on what appears to be a relatively simple statute under the Bankruptcy Code. Section 303 of the Bankruptcy Code outlines a very specific process for an involuntary petition to be filed. Provision B sets forth the number of creditors, the type of creditors that need to file a case. Very simple. But don't we have case law which states that bad faith trumps all that? Not in an involuntary setup, your honor. So there is case law that talks about involuntary petitions and the dismissal of those petitions. Every single one of those cases, your honor, starts with B hasn't been complied with or H hasn't been complied with. Had Congress intended bad faith to be at that upfront analysis? Do you have the right number of creditors? If yes, let's proceed. H, are they not paying their debts as they become due? Or there's a second provision which isn't relevant in this case. H1, are they not paying their debts as they become due? Check. The court shall order relief. Later, it goes I. And then bad faith and good faith, what have you, are reflected in I. I take this as, your honor, all the cases point to a sort of strict liability type of statute. But if you don't comply with B, then there have been cases that say, well, if you've shown good faith, we're going to let you remediate under 303C. Get additional creditors in. But there have been cases that say, if you haven't followed B, you don't have the right number of creditors. In fact, the last case cited by the appellee, Centennial Insurance, is a case where there were supposedly three creditors. There weren't. The court found there were two, two bona fide creditors, only two. And the court would not allow a remediation under C. But the court first found noncompliance with B. On a larger picture, if the bankruptcy judge looks at the involuntary petition and assesses all the circumstances for the petition, and says in complete review of all the facts and circumstances, this petition is not presented here for a valid bankruptcy purpose. This petition is invoking the jurisdiction of the court for a bad purpose, not for bankruptcy purpose. Your suggestion is that the bankruptcy court has no power to address that circumstance. If B is met and H is met, that is correct, your honor. How about the equitable power of the court? Bankruptcy is an equity court. Yes. Fashioning remedies that are appropriate to the circumstances is part of equity. And with that equity, your honor, that's why Congress wrote in these minimum requirements. So for the other side, all these cases, cases that talk about bad faith, some bad faith like integrated, it's about the debtor's conduct. So here, let's look to, if we even look to the bad faith of the creditors in this case, your honor, we go beyond. And I don't think we need to. I think it is a strict liability statute. Compliance under B, proof under H after trial that they are not acting in a certain fashion, the court shall. Had Congress wanted that sort of equitable play to exist, then like an I with the sanctions provisions, it would have said may. Well, I don't recall what the provision is, but there is a provision in the Bankruptcy Code where the bankruptcy may exercise equitable powers in order to effect the purpose of the Bankruptcy Code. There is certainly, 105 certainly says that there are equitable powers. So, your honor, I'd look to the facts of this case. You have three judgment creditors. However, what the courts looked to is they looked to a fourth action, not to the three judgment creditors. There wasn't pending litigation for any of those three judgment creditors. They are all judgment creditors. End of story. So, then we have this analysis of bad faith that was done by the two lower courts. The two lower courts looked to a fourth proceeding that had nothing to do with the underlying judgments that had been obtained. One by default, and two by consent of Forever Green. They're judgments, so there's no really need to analyze how they got them, but two were by consent. There's a fourth action that the courts have looked to, and it's this fourth action that they were trying to determine bad faith. And that's not appropriate to reach beyond the judgment creditors that were in place. They looked to this fourth action and how those judgment creditors impacted that fourth action. What was the purpose? Generally speaking, what is the purpose of filing an involuntary petition in bankruptcy? It's where creditors are frankly not being paid. There's a business not in activity, and there are funds that are going to unknown sources that the assets of the bankruptcy estate are being dissipated potentially. Wasn't it well known that there really were no funds to dissipate? No, Your Honor, because there were accounts receivable in this bankruptcy estate. There were two pieces of litigation. In fact, one of the pieces of litigation was removed into the bankruptcy court. One of the pieces of litigation involved one of the creditors. That's true. The creditor is a judgment creditor. True. He's entitled to enforcement. The bankruptcy court determined that the reason for filing the involuntary petition was to put a halt to the case in the state court, to the arbitration. Actually, the court to the arbitration. The court made a determination as to this asset. There was a petition in the state court to reactivate the arbitration. I don't think there was a petition. Well, there was a case, an actual case filed to get the arbitration started. I thought the arbitration had been stopped. It had been. I apologize for interrupting, Your Honor. But I think that was part of the bad faith, that the action in bringing the involuntary bankruptcy was to stop the arbitration, which was then stopped. So the interesting thing, Your Honor, there is the case that sought to get the arbitration rolling again was removed into the bankruptcy. It doesn't make sense to stop the action if it's removed into the bankruptcy so it can proceed. So it actually could have been heard within the bankruptcy. In fact, it's an asset. It's one of the largest assets that would have been marshaled. Right, and Mr. Dawson has been making statements, which are of the record, which were part of the bankruptcy, part of the district court finding that Mr. Dawson was going to take steps to stop the arbitration, and one of those was to file the bankruptcy. Your Honor, so... File the involuntary bankruptcy. That's something that happened previously. Okay, and that's part of the finding of bad faith. Well, here's the troubling part, Your Honor. The involuntary bankruptcy was filed not through any genuine desire to collect because Mr. Dawson has admitted that he's way down on the list, but because he then said the arbitration has to be stopped for various reasons, one being the claim that can the arbitrator still be impartial, one being the claim that because there's a bankruptcy, things have to stop, although that's arguable. It was actually Mr. Day, the president of Fairbourn Bean, that said Mr. Dawson was at the end of the list, not Mr. Dawson. Mr. Day said Mr. Dawson will get paid in due time. He's not at the top of the list. Right, he isn't. Wilmington Trust or M&T Bank. Potentially, but we don't know where they sit in that list. The other part, Your Honor, is that we're focusing on Mr. Dawson. There's no findings as to Kelly Dawson, who held a judgment in sufficient amount, or Cohen Saglias, also, who held a judgment in sufficient amount. So we have compliance with... Well, it was Mr. Dawson who filed the petition, isn't it? No, that's all three of them. So that's a flaw... Tell me on the issue of dissipating it. Were there really any assets that could be dissipated? Well, Your Honor, there was talk of a $50,000 account receivable that Mr. Day testified that he was collecting receivables. At the same time, he testified that during the same period that he's collecting receivables, no receivables, no money, no nothing went into the Forever Green account. It is a financial impossibility. Well, legal financial impossibility that you collect money in, it doesn't go into your account, and it's not there. So there was money that was coming in that didn't appear anywhere. In fact, Judge Coleman found it suspicious, ended up ignoring that fact in the findings and conclusions. But that's in the findings. Where she said, it's in the record, during the trial, she said, this doesn't make much sense. And that's where they're going to, meaning the creditors, that they're assets. There's a malpractice case that's also there. We don't know the value. There is this arbitration. We don't know the value. There are also other assets. There was a balance sheet presented in the underlying court, in the trial court. It has assets and liabilities. All of that has to be marshaled by a trustee. And that's sort of why the provision doesn't say, three creditors, not paying your bills, and you have to show a balance sheet test. So, in fact, the legislative intent from Congress specifically denounced the balance sheet test. This idea of, let's look at assets and liabilities. In the legislative history of the statute, it says, no, we're not looking at that. So they set forth a relatively standard test. But if we look even beyond, Your Honors, and look at this idea of bad faith, it's a judgment creditor. All three of them were judgment creditors. And what Forever Green did is picked off one, picked off the angriest of the three angry creditors. Creditors don't come in to an involuntary and say it with a smile. Hi, we're going to do an involuntary. This is why Congress wrote three bona fide, non-contingent creditors. Did anyone prevent a third creditor from joining the petition to have the statutory required three? Well, Your Honor, we have the three judgment creditors. The court, Judge Coleman's order, the first finding of fact is that we have three creditors. We don't have any knowledge of needing to go beyond that there are more than 12 creditors. Sort of an indication that we only needed one. Well, Mr. Dawson could have been replaced. Yes, and we asked for that. And we had asked for that right. You asked for it? Mm-hmm. At the time he was replaced? At the time, yeah. At the time that he was removed as a creditor? Yes, Your Honor. And what happened? That was denied. That was denied on district court appeal as well. Because there, when B isn't complied with, there is no question that the court has the authority to say, if you don't comply with B, three creditors, three non-contingent. But then there's been a finding of bad faith. There are cases which have held then that we aren't going to let you bring in any more creditors. Exactly. So if you don't comply with B up front, which we did, there's no question we comply. Well, when there is a finding of bad faith, and there has been a finding, and there are other cases where there has been a finding of bad faith, and the court has said, you're out. Because of the bad faith, you're out. You can't bring in other creditors. That's only when B hasn't been complied with, Your Honor, meaning there weren't sufficient creditors at the start, meaning there weren't sufficient compliant creditors. In fact, the Continental case, three creditors, the court had a hearing, found two were compliant, and there was a bona fide dispute on one. Well, it has to be no bona fide dispute. So very simply, in the Centennial case, we have three petitioning creditors, of which the court has a hearing on the validity of those three and finds one's not valid, not for bad faith, for statutory compliance, for not being non-contingent bona fide. The court made that finding and then said, well, you didn't comply, and since you didn't comply and we felt there was bad faith, a later analysis for non-compliance, we're not going to let you cure. In fact, the Hartford had come in and said, we want to be the new third. No, we're not going to let you. The court in all bankruptcy says the rationale is that public policy prohibits entertaining any case commenced upon a petitioner's conduct which amounts to fraud upon the court. And here the issue is, was this case brought by Mr. Dawson not through any sincere belief that he needed the protection of the involuntary bankruptcy, but that he wanted to stop the arbitration? And having made that finding, then if one follows the rationale in Norton, that taints the whole proceeding and you aren't going to look around for other creditors to bring in. You're going to say because of the bad faith, because of the taint upon the initiation of the proceeding, we are not going to allow this to proceed further. Well, I'll address that with two issues, Your Honor. The bankruptcy court would take jurisdiction over the arbitration to be able to proceed so that bankruptcy does not stop the arbitration. That's a flaw. I think Cannon addresses this. Well, Dawson said he wanted to stop the arbitration along with a whole bunch of other statements. Well, one of the cases talks about pre-petition statements. And so his comments pre-petition to stop it are irrelevant to what actually happened. In fact, the petition would not stop the arbitration. Well, aren't they part of the finding of bad faith? Your Honor, I think they were incorrect findings that it would stop the arbitration. So are you saying that the decision of the bankruptcy court was against the weight of the evidence? I mean, that doesn't seem to be what the appeal before us is, is it? No. I think it was contrary to the law, that the arbitration could not be stopped by the filing of a bankruptcy. It's just an incorrect finding. Well, it's Mr. Dawson's statements about what he's trying to do, about his motivations, whether he's right, whether he's legally correct, whether he consulted with you first and got a good legal opinion. The court found that these statements indicate bad faith on his part. And having initiated the petition for involuntary bankruptcy in bad faith, the court is not going to look around to find other creditors to come in and pursue this petition that the court has found was filed in bad faith in the first place. I'll say that's why the strictures of B-1. And there is no analysis of his good faith or bad faith, as he's a bona fide creditor, uncontingent bona fide judgment creditor. I'm out of time, Your Honor. Thanks very much. Thank you. Mr. Corrales. Good afternoon. May it please the court, Aris Corrales on behalf of the appellee for Evergreen Athletic Field, Inc. Your Honors, it is our position that the law in this circuit is clear. This court of appeals has stated that bankruptcy petitions, whether under Chapter 7, Chapter 11, or Chapter 13, are subject to dismissal if they are filed in bad faith. In INRAE Integrated Telecom, which is a 2004 decision of this court, now that was a voluntary Chapter 11 petition, this court held Chapter 11 bankruptcy petitions are subject to dismissal unless filed in good faith, and the burden is on the petitioner to establish that it has been filed in good faith. Also, in INRAE Ronald Tamiki, which is a 2000 decision of this court, this court affirmed in that context it was a Chapter 7 voluntary petition, but the court affirmed the dismissal of that voluntary Chapter 7 petition because the debtor acted in bad faith. In INRAE William Neely, that's a decision of this court of 2002, and I will point out to the court that it's a non-published opinion, but it has significance because this court basically said that under this circuit's case law, an involuntary Chapter 7 petition filed in bad faith is subject to dismissal, and the court went on to cite three other precedential decisions of this circuit, the first being Tamiki, Tamiki, INRAE Tamiki was a 2000 decision as I described, voluntary Chapter 7 debtor dismissed for bad faith, INRAE SGL Carbon Cork, which was a 1999 decision of this court, there a voluntary Chapter 11, again dismissed for bad faith, and also INRAE Lilly, which was a 1996 decision of this court, in that case it was a Chapter 13 petition, also dismissed because it was filed in bad faith. I'll also point out to this court that there is another published opinion that deals with an involuntary petition, and that is Landon v. Hunt, that was decided by this court in 1992, and in that particular case the court affirmed dismissal of the involuntary petition where the appellants and their attorneys abused the system by filing the involuntary petitions in bad faith. We believe it is clear that the decisions of this court in our district and many sister courts basically provide that an involuntary Chapter 7 bankruptcy petition is subject to dismissal if it is filed in bad faith. We believe the next step is now what is the test that the bankruptcy court should follow when it believes something has been filed in bad faith. Well, I think the appellant hasn't said, has he said that the bankruptcy court was wrong in finding bad faith? He simply says the bankruptcy court shouldn't have looked at it. Well, Your Honor, I believe he did the former, and therefore I thought the latter flows from it. We believe what the bankruptcy court here did was obviously proper. I do want to point out to this court that this court has actually established a test. Now, that test was established in two decisions of this court as to how to deal with whether, how do you determine whether it was in bad faith? Okay, but I think the appellant isn't arguing, has more or less conceded it was in bad faith. He's saying that's irrelevant, so you don't need to persuade me on that. I can move on if that is conceded, Your Honor. So in this particular case, the bankruptcy court utilized the test that was been adopted by this court, which is the totality of the circumstance test, to determine if the involuntary petition against Forever Green was filed in bad faith. And what the court took specific note of is the record. There was two days of hearings held, evidentiary testimony presented, and what the court took special note of is the conduct of this petitioning creditor. And what happened here is back in 05, Forever Green had commenced litigation against an entity called Pro Green and others seeking damages in excess of $5 million. This was arising from the diversion of corporate assets and opportunities. In that action, it was Mr. Dawson who played the central role in that underlying scheme and used his position, he was a sales rep in the past for Forever Green, to divert these corporate assets. So litigation was commenced in June of 05 in Bucks County. That action was then removed in July of 05 to the Eastern District of Pennsylvania before the district court. At the same time that Mr. Dawson removed that action, he then proceeded in Louisiana to file an action against Forever Green and its officers seeking unpaid commissions which they alleged Forever Green owed to Mr. Dawson and his wife.  The district court here, the parties, Mr. Dawson being a party in that, basically agreed that we should go to binding arbitration. And Forever Green agrees, the Pro Green parties, Mr. Dawson, they agree, they sign an arbitration, a binding arbitration agreement on April 1st of 08 saying we'll resolve all claims except the Louisiana claim. So as that's going on in Pennsylvania, and one of the other significant things about the arbitration agreement is it has a cooperation clause, as the bankruptcy court points out, that says that the parties will all assist and implement, to help implement the agreement and proceed to arbitration. So that's going on in the Eastern District of Pennsylvania. On March 2nd, 2011, a consent judgment is entered in Louisiana in favor of Mr. Dawson and his wife and against Forever Green for $306,000. No sooner is that consent judgment entered that what happens is they file a petition in front of the arbitrator here in Pennsylvania on the district court action to basically say, we want to terminate the arbitration. And their basis for trying to terminate the arbitration is that Forever Green is insolvent, that neither it nor its officer Mr. Day or his colleague have the ability to pay or basically the desire to pay the arbitration fees. Now, when they made that statement, as the bankruptcy court found, Forever Green, Mr. Day, had already funded the arbitration fees. It also listed the judgment that Forever Green had, obviously, that Mr. Dawson had against Forever Green, including the Cohen-Seglius judgment, and it basically said to the arbitrator, anybody can move forward and garnish the assets of Forever Green, and for this reason this arbitration should be terminated. Well, as they said in the motion to terminate, the next thing they did is they transferred the judgment from Louisiana to Philadelphia Court of Common Pleas, caused the writ of execution to be issued, and garnished Mr. Venzi, who was the arbitrator and his law firm, because he was, in fact, holding the balance of an advance deposit on fees. In response to that action, the arbitrator basically said, he's now in a position of being adverse to the parties, and the implications of that are, I have to suspend the arbitration. Forever Green, in response to that, files a complaint in Philadelphia Court of Common Pleas, seeking declaratory relief, basically seeking to reinstate the arbitration, and on March 6 of 2012, the Philadelphia Court of Common Pleas, and this is all, of course, in the record before the bankruptcy court and the basis for the court's finding, the Philadelphia Court of Common Pleas issues a scheduling order in anticipation of the declaratory relief, which basically was, whether the payment made to the arbitrator, inclusive of the advance deposit, were immune from garnishment and free of claims of Mr. Dawson. Scheduling order is issued by March 30, joint stipulation of facts due. That is filed. April 18, 2012, Forever Green has to file its memo of law. Forever Green files its memo of law. By May 3, 2012, the defendant's memo of law is due. They don't file their memo of law. Why? Because before that date came, on April 20, 2012, they filed this involuntary petition against Forever Green. But not only do they file the involuntary petition, they file the petition, and then immediately they run and file a suggestion of bankruptcy in front of the Court of Common Pleas in Philadelphia. Now, one of the things, Your Honors, you should keep in mind, the difference of an involuntary petition is it's creditors who are moving, whereas normally a voluntary petition, it's the debtor that's seeking relief. So here, Mr. Dawson, the appellate, files the involuntary and immediately files a suggestion of bankruptcy in Philadelphia Court of Common Pleas, knowing that that court will immediately, seeing a suggestion of bankruptcy, defer the matter because of the automatic statute. He doesn't notify Mr. David he's filed the involuntary bankruptcy. I'm sorry, Your Honor, I didn't hear that. He doesn't notify Mr. David he's filed the involuntary bankruptcy. No, and I will spare the Court. There's a whole background of what occurred with improper service. I mean, we've read the briefs, you know. But yes, Your Honor. And what happens now is the Philadelphia Court of Common Pleas is stayed on this involuntary, and basically on May 14th, Mr. Dawson then proceeds to remove the arbitration and that action to the bankruptcy court. Normally it's the debtors that are doing these types of actions, not a creditor. Now you step back and say, well, why? Why would he be doing all this? Well, we depose Mr. Dawson in the context of the involuntary, and this is what the three key points of his deposition, as the bankruptcy judge noted, were. One, he obtained the consent judgment because he wanted to get paid. Two, he was going to find any available asset that Forever Green may have to try to use to lean upon and seize it. And three, he did this because he wanted to stop that arbitration. Now, while this was going on, before the involuntary was filed, Forever Green receives a call from Mr. Dawson's Louisiana counsel. That, too, is very telling because that counsel basically says, well, if in fact you're prepared to do a couple of things, we can settle this globally. One, we'll give you favorable testimony in connection with your malpractice action, which was pending in Louisiana, and if you're willing to basically pay our judgment in full, we'll provide that testimony. Two, some of his partners had a guarantee to Wilmington Trust, which eventually became M&T Bank. If you could obtain a release of those personal guarantees, we would discharge this judgment. And by the way, if you don't make a deal with us, this arbitration will be in an indefinite status of suspension, and unless until our judgment is paid, we will not allow this arbitration to go forward. It is all of those facts that were put into the record and that the testimony supported that caused the Bankruptcy Court to issue the decision it did. We believe that the Bankruptcy Court, after considering the totality of the circumstances and the facts and the record that was established by the preponderance of the evidence, she made very significant findings, all of which justify a bad faith filing here and the dismissal of the petition. Well, looking at the statement of the issues presented by the appellant, he's not arguing that Mr. Dawson was not in bad faith. So, I mean, that part of the appeal is the bad faith is established as to Dawson, and doesn't it all just flow from there? Well, it does, Your Honor, and the other significant thing that the appellant is raising and raised today in oral argument is this issue of somehow once that's determined, you can cure it. And I want to point out to this Court that we don't believe that is the case, first of all, for a number of reasons. On page 39 of the appellant's brief, he cites to Section 303C, and he says that they requested time to conduct discovery of joining additional creditors under 303C and that such request was not ruled upon by the Bankruptcy Court at trial. Now, I heard during oral argument that there was a statement that it was denied, but I'm going to proceed and tell the Court what we believe has happened and what the record actually shows. But the appellant's brief also goes on to say that the Bankruptcy Court should have provided an opportunity to add additional creditors to the involuntary petition to cure deficient filing. We don't believe that is accurate either. Now, if you review the trial transcript, on page 39 of the appellant's brief, they cite to the trial appendix A321 through 322. And that is when the colloquy between Mr. Eisenberg, appellant's counsel, and the Court began this discussion about 303C and an ability to join creditors. But it shouldn't stop at page 322. You've got to continue to read the additional pages, which is page 323, lines 8 through 25, and A324, lines 1 through 20. When the colloquy continues between Mr. Eisenberg and the Bankruptcy Court, the Court goes on to say, so I'm either going to find Mr. Dawson had filed in good faith, because if he didn't file in good faith, I don't have three creditors. And Mr. Eisenberg, referencing section 303, now they had been going back and forth on 303C. That's what he was mentioning. The Court then says, well, look, I want to make it clear. I'm not going to provide any advisory opinion on this point. Mr. Eisenberg states he's not seeking an advisory opinion and would file an appropriate motion to put the issue before the Court. The Court then continues to say I'm not ruling and I'm definitely not going to look at this issue until it's filed, because you may never file it. So I have to look at what I have and come down to a call if you file something or not. That hearing took place on March 4th. That was when the record closed. Post-trial briefs were submitted on March 22nd of 2013. The Bankruptcy Court didn't rule for about seven-some months later. The significance is during that period no motion was ever filed by the appellant, as stated at the time of the hearing. Further, so it's our position that the argument that somehow he has a right to join others has been waived. But if you do a literal reading of section 303C, we believe that a reading of 303C indicates that this argument is moot, and the reason it's moot is no creditor came forward to join or sought to join in this petition. And therefore, the requirement of 303C is in order to have somebody join, they must do so before the bankruptcy rules to dismiss or before the bankruptcy grants the relief. So for those reasons, we believe it's moot as well. Now, the district court, we correctly stated that many courts and Norton's and a lot of the commentaries out there state that when the court has a situation of bankruptcy. You realize, John, we've read the briefs and we've read the district court opinions, so we know what's there. You don't have to persuade us. It's there. I just want to make sure I've cut the point across. I know my time is up, Your Honor. I give us a cross. Thank you. Mr. Eisenberg. Thank you, Your Honors. I go back to Landon v. Hunt, another case with an involuntary, another case where 303B was not compliant. Landon v. Hunt is about a desk that was bought for $15,000, was a $220,000 desk, and involuntary bankruptcy was used as a litigation tactic as to the underlying claim that was the core to that involuntary bankruptcy. You get to deal with the complexities of an involuntary case where we have three judgment creditors complies with B. H, not paying their debts in a timely fashion. The court shall order relief. The other case is about good faith, bad faith, Your Honors. Temecki. What we do here, we have a finding of bad faith on the part of Mr. Dawson. I mean, that's accepted. That's not appealed. Your Honor, we should have never been at a finding of bad faith because it should have been irrelevant. Well, but we have one. We have one. I understand that. And that was challenged in my brief. We challenged it. It's not one of the issues on appeal. It's not specifically one of the issues on appeal. Well, then it's not on appeal, is it? Well, should the court have dismissed the case, that is core to the court's dismissal, this finding of bad faith. That is all that it is about, Your Honor, this idea of bad faith. That is really the heart of the issue. Right. If they found bad faith, and Judge Dozell affirmed the finding of bad faith, then because it was filed in bad faith can preclude the addition or the permission to bring in other parties. Well, I don't think the need for additional parties was even there. That's one of the issues that we raised. That's our third issue on appeal, Your Honor. But it's not core to this matter. Well, your third issue is whether the district court erred in affirming the dismissal of the involuntary where creditors were not afforded an opportunity to seek additional creditors after the bankruptcy court finding bad faith as to a single creditor. Essentially 303C. Yeah. 303C should have never come in here. And Judge Dozell, in his opinion, said that you could not cited learned treatises and cases which held that if there's bad faith you don't need to look further. Well, and with the investigation of bad faith, we're looking at 707A, or the evaluations of bad faith in Chapter 7. That's a debtor file petition, and that is bad faith on the debtor. The code doesn't use the word bad faith. It says basically concealing assets, basically acts of bad faith, looking to the debtor, failing to file schedules, conduct of the debtor in 707. Those are the bad faith examinations in Chapter 7. In Chapter 11, we're looking at 1112B. Again, actions of the debtor to conceal assets not proposing a valid plan. And, again, in Chapter 13, the first chapter that we actually have the use of good faith. A plan has to be proposed in good faith. It's 1307 and 1325. 1307 makes mention to conduct of the debtor. 1325 says a plan has to be proposed in good faith. Uses the word good faith. This statute, 303, is the only statute that I can see that contains, here are your requirements for getting a petition granted, and says the court shall order relief. Doesn't require good faith, bad faith in the front end review. Why? Because you have angry creditors who are allowed to use judgments in all different ways. That's an allowance of this code, Your Honor, to find, to uphold that this petition is going to be dismissed because of the finding of a judgment creditor acting in bad faith to enforce his judgment using all means, is basically you're now going to test. You're adding another test into 303B. No. No? You're saying the first test is bad faith. If there is a claim of bad faith, if you find bad faith, then that petition brought in bad faith, brought for reasons not pursuant to what the bankruptcy code is trying to do, brought for the personal reasons of the person filing the petition for an involuntary bankruptcy who may be joined by two other people. His bad faith takes the whole thing. It's over. That's it. You can't look around to find other people to come in. Now, maybe those other people could independently decide we want to file our own petition, but as to the petition filed by Mr. Dawson where the district court has found it was filed in bad faith, that's the end of Mr. Dawson's petition. Your Honor, there are still two other creditors that were valid, and Mr. Dawson still is a valid judgment creditor under this analysis. And his bad faith takes the whole thing because he did not file it in pursuit of his remedy as a judgment creditor. He filed it for other nefarious reasons found by the bankruptcy court and affirmed by the district court. I don't think there were any nefarious reasons set forth in the judgment. Well, that's why they found bad faith. And you have not appealed that finding of bad faith. There was no evidence that Forever Green was making preferential payments to certain creditors. Your Honor, there was evidence that they were collecting accounts receivable and they weren't going anywhere. Who is they? They disappeared. What? We're talking about creditors. We don't know who they were paying because there wasn't evidence. By they, Forever Green was making certain preferential payments to certain creditors over others? Well, Mr. Day and Forever Green, we don't know who was making the payments because the court surmised that when Mr. Day said, I'm making the payments, that it was sufficient. But the evidence showed, as Mr. Day testified, that there's accounts receivable being collected into the company, as Mr. Day testified, and the money's not hitting the bank accounts it's going elsewhere. That's a problem. That's a preferential treatment. Who it went to, we don't know. Well, I can give you the site from my brief if you'd like as to where that was in the court testimony. Oh, we have that. Okay. So. All right. We're good. Thank you very much. Thank you both for your arguments. We'll take the case under advisement. And we'll recess. Please rise. Court stands adjourned until July 15th at 9 a.m.